FRED PETERSON ET AL. V. STATE OF NEBRASKA.

FILED MAY 24, 1907. No. 14,834.

1. **Criminal Law:** JURISDICTION. The judgment of a court having no jurisdiction of the subject matter does not constitute a bar to a second prosecution based upon the same charge as that upon which the first judgment was pronounced.

2. **Interstate Commerce:** RAILROADS: SPEED ORDINANCE. An ordinance limiting the speed of trains on an interstate railway which carries United States mail to ten miles an hour within the corporate limits of the municipality, which is passed for the safety of the public and the protection of life and property, is not void as imposing an unreasonable restriction upon interstate commerce and the speedy transportation of the mail.

3. **Cities:** ORDINANCES: PRESUMPTION. The determination of the question whether an ordinance is reasonably necessary for the protection of life and property within the city is committed in the first instance to the municipal authorities, and, when they have acted and passed an ordinance, it is presumptively valid, and the courts will not interfere with its enforcement until the unreasonableness or want of necessity of such measure is made to appear by satisfactory evidence.

4. ———: ———: VIOLATION: EVIDENCE. A prosecution for the violation of a city ordinance, which does not embrace any offense made criminal by the laws of the state, while in form a criminal prosecution, is, in fact, a civil proceeding to recover a penalty, and clear and satisfactory proof that the offense has been com-

mitted is sufficient to sustain a conviction.  Proof beyond a reasonable doubt is not required.

5. **Fines:** Imprisonment for Debt.  Fines or penalties arising from a violation of the penal laws of the state, or city or village ordinances, are not debts within the meaning of our constitutional provision prohibiting imprisonment for debt.  *Kennedy v. People,* 122 Ill. 649.

Error to the district court for Colfax county: Conrad Hollenbeck, Judge.  *Affirmed.*

*Edson Rich* and *Phelps & Peterson,* for plaintiffs in error.

*W. T. Thompson, Attorney General, Grant G. Martin.  T. F. A. Williams, W. I. Allen, I. H. Hatfield, C. M. Johnson* and *F. B. Churchill, contra.*

Duffie, C.

Schuyler is a city of the second class having more than 1,500 and less than 5,000 inhabitants.  An ordinance of the city, approved August 16, 1904, designed to regulate the speed of railroad trains passing through the city, provided that it should be unlawful for any person, or railroad company, or any employee managing, operating or controlling any locomotive engine, car, or train of cars, to run or permit to be run or propelled or operated any locomotive engine, car, or train of cars within the limits of the city at a rate of speed greater than ten miles an hour, provided that the rate of speed of any such engine, car, or train of cars, shall not be restricted on any railroad in said city where competent watchmen for the purpose of signaling the approach of any engine, car, or train of cars, are stationed at all public crossings of such railroad, which are thoroughfares, which watchmen shall so signal the approach of every such engine, car or train of cars, nor on any railroad in said city which has. or shall have erected or placed at all public street crossings of said railroad, which are thoroughfares,

gates or bars, so constructed as to be quickly lowered and raised across any such street so crossing such railroad, and to remain closed during the entire time of the arrival and departure of any train running at a higher rate of speed than ten miles an hour, and which gates or bars shall be so situated as to cut off traffic across such railway at such street crossings while said gates or bars are closed. A penalty of not less than $25 nor more than $100 was provided for a violation of the ordinance. Section 8733, Ann. St., authorizes cities of the second class to regulate the running of railway trains and to govern the speed thereon within the limits of the city.

December 6, 1905, plaintiffs in error were arrested under a warrant issued upon the complaint of the city attorney charging them with the violation of the ordinance. The defendants, prior to this proceeding, and on November 4, 1905, had been arrested upon the same charge. They were tried and convicted before one V. W. Sutherland, a justice of the peace, claiming to act as a specially appointed police judge for the city of Schuyler. The district court released them on habeas corpus, on the ground that "in said alleged proceedings said Sutherland was without jurisdiction and said proceedings and judgment were and are void." It is elementary that the judgment of a court having no jurisdiction of the subject matter is absolutely void, and constitutes no bar to further proceedings on the same charge. *Thompson v. State,* 6 Neb. 102; *Arnold v. State,* 38 Neb. 752. The defendants, after having procured their discharge on the ground that the court before which they were tried had no jurisdiction of the offense charged against them, and that the judgment under which they were held was absolutely void, cannot now interpose that judgment as a bar to another trial before a court having jurisdiction of the offense with which they stand charged. This is conclusive of the first point raised by the defendants that they were twice placed in jeopardy.

It is next insisted that a municipal corporation, in the

exercise of its police power, cannot impose such restriction as will interfere with the governmental agency of the United States to unreasonably impede interstate commerce and retard and delay the speedy transportation of the United States mail. It is urged that the Union Pacific Railroad Company sustains relations to the federal government different from that of any other railroad in the state, because of the conditions under which it was built and the obligations imposed by the charter of the company. It is said that those roads which the government did not aid in building perform a voluntary service in carrying the United States mails, while those aided by the government rest under an obligation by the terms of their charter to do so, and that their service in that respect is obligatory. It is further urged that commerce between the states has been confided exclusively to congress by the constitution, and is not within the jurisdiction of the police power of the state, and that, while the state may make reasonable regulations to secure the safety of passengers and of the people of the state, it can do nothing which will directly burden or impede the traffic of railway companies engaged in interstate commerce, or which will impair the usefulness and facilities of such traffic. On these grounds it is argued that the ordinance under which the defendants were convicted on their second trial is unreasonable and void.

This question in various forms has been before the supreme court of the United States on several occasions. In *Illinois C. R. Co. v. State,* 163 U. S. 142, the court had before it a statute of the state of Illinois which provided that "every railroad corporation shall cause its passenger trains to stop upon its arrival at each station, advertised by such corporation as a place for receiving and discharging passengers upon and from such trains, a sufficient length of time to receive and let off such passengers with safety: Provided, all regular passenger trains shall stop a sufficient length of time at the railroad station of county seats to receive and let off passengers

with safety." It appears from a statement of the facts
that the line of railroad communication crossing the Ohio
river at Cairo, of which the Illinois Central Railroad
Company forms part, has been established by congress
as a national highway for the accommodation of interstate
commerce and of the mails of the United States; that the
station of the Illinois Central Railroad Company at the
southern terminus of its road in the city of Cairo was at
a point three and a half miles distant from so much of its
main track as formed part of the through communication
by railroad from the state of Illinois across the Ohio river
into the state of Kentucky and other states on the through
connecting lines, and it was the contention of the railroad
company that the particular train in question, a fast mail
train, was not compelled to leave the direct and through
route of travel and switch down to the depot in Cairo
three and a half miles from the through line, the people
of that city being sufficiently accommodated by other
trains operated by the company. The court held that
a fast mail train carrying interstate passengers and the
United States mail from Chicago to places south of the
Ohio river, over an interstate highway established by
authority of congress, need not turn aside from the direct
interstate route and run to the station in Cairo three and
a half miles away from that route and back again, in
order to receive and dispatch passengers at that station
for the interstate travel to and from which the railroad
company furnished other and ample accommodations,
and that the statute, in so far as it required this to be
done, was an unconstitutional obstruction of interstate
commerce and of the passage of the United States mails.
In the same case it was said, however, "that the arrange-
ments made by the company with the post office depart-
ment of the United States cannot have the effect of abro-
gating a reasonable police regulation of the state."

In *Cleveland, C., C. & St. L. R. Co. v. State,* 177 U. S.
514, that part of the Illinois statute above quoted, which
required all passenger trains to stop at county seats,

was before the court on petition of the state's attorney
to require the defendant company to stop a train known
as the "Knickerbocker Special" at the city of Hillsboro,
the county seat of Montgomery county.  In that case it
was shown that the "Knickerbocker Special" was a train
especially devoted to carrying interstate transportation
between the city of St. Louis and the city of New York;
that the travel between these cities had grown to such
an extent that it had become necessary to put on a
through fast train which connected with other similar
trains on the Lake Shore and New York Central roads,
and that it was necessary to put on this train, because
the trains theretofore run (none of which had been taken
off) could not, by reason of stopping at Hillsboro and
other smaller stations, make the time necessary for
eastern connections or carry passengers from St. Louis
to New York within the time which the demands of busi-
ness and interstate traffic required; that the train was not
a regular passenger train for carrying passengers from
one point to another in the state of Illinois, such traffic
being amply provided for by four other trains, and that
the "Knickerbocker Special" was used exclusively for
interstate traffic from and to points without the state of
Illinois.  In that case it was held that the requirement
that all regular passenger trains must stop at county
seats, which is made by the Illinois act of March 21,
1874, constitutes a direct burden upon interstate com-
merce in violation of the United States constitution, so
far, at least, as that statute requires through interstate
passenger trains to stop at such stations when adequate
through service has been provided for local traffic.  In
that case it was said: "Few classes of cases have become
more common of recent years than those wherein the
police power of the state over the vehicles of interstate
commerce has been drawn in question.  That such power
exists and will be enforced, notwithstanding the consti-
tutional authority of congress to regulate such commerce,
is evident from the large number of cases in which we

have sustained the validity of local laws designed to secure the safety and comfort of passengers, employees, persons crossing railway tracks, and adjacent property owners, as well as other regulations intended for the public good." The court further said: "The distinction between this statute and regulations requiring passenger trains to stop at railroad crossings and drawbridges, and to reduce the speed of trains when running through crowded thoroughfares, requiring its tracks to be fenced, and a bell and whistle to be attached to each engine, signal lights to be carried at night, and tariff and time tables to be posted at proper places, and other similar requirements contributing to the safety, comfort and convenience of their patrons, is too obvious to require discussion."

In *Stone v. Farmers Loan & Trust Co.*, 116 U. S. 307, it was held that, in case of a railroad whose construction had been aided by congress so as to establish a route of travel through several states, a state had the power to make all needful regulations of a police character for the government of the company operating the road within the jurisdiction of the state. It was there said: "By the settled rule of decisions in this court   *   *   *   it may make all needful regulations of a police character for the government of the company while operating its road in that jurisdiction. In this way it may certainly require the company to fence so much of its road as lies within the state, to stop its trains at railroad crossings, to slacken speed while running in a crowded thoroughfare, to post its tariffs and time tables at proper places, and other things of a kindred character affecting the comfort, the convenience, or safety of those who are entitled to look to the state for protection against the wrongful or negligent conduct of others."

In *Crutcher v. Kentucky*, 141 U. S. 47, Mr. Justice Bradley, speaking for the court, said: "It is also within the undoubted province of the state legislature to make regulations with regard to the speed of railroad trains in

the neighborhood of cities and towns, with regard to the precautions to be taken in the approach of such trains to bridges, tunnels, deep cuts and sharp curves, and, generally, with regard to all operations in which the lives and health of people may be endangered, even though such regulations affect to some extent the operations of interstate commerce. Such regulations are eminently local in their character, and, in the absence of congressional regulations over the same subject, are free from all constitutional objections, and unquestionably valid."

Here is a distinct recognition of the rights of the state to enact all reasonable police regulations necessary to protect the people of the state in the enjoyment of their property and to guard them from injury by the operation of trains through thickly populated communities. It will be observed that in the two cases first above referred to, no question of the protection of life or of the person from bodily injury was drawn in question. The only feature presented by the cases was the right of the state to require, in one case, a fast mail train to depart from its usual route for the accommodation of the citizens of a city for whose benefit other ample accommodations had been provided, and, in the other case, to require a train specially devoted to interstate commerce to stop at a county seat for the accommodation of its citizens who were amply provided with accommodations by four other daily trains. The difference between those cases and the one we are considering is manifest. The ordinance in question is designed, not for the mere accommodation of the residents of Schuyler in the use of the trains of the company, but it is to protect them against loss of life or bodily injury from the operation of trains running through its limits. In such case, unless the ordinance is wholly unreasonable, it ought to receive the support of the courts. In *Chicago & A. R. Co. v. Carlinville*, 200 Ill. 314, 60 L. R. A. 391, it was held that an ordinance limiting the speed to ten miles an hour within the corporate limits is not unreasonable, where the road lies for a mile and a

quarter within such limits, and crosses four streets, two of which are main thoroughfares, and buildings located near the road obstruct to a considerable extent a view of the tracks and approaching trains, although the principal part of the buildings of the municipality are located on one side of the road; and it was further said that an ordinance limiting the speed of trains on an interstate railway which carries the United States mail to ten miles an hour within the corporate limits of the municipality, which is passed for the safety of the public and the protection of life and property, is not void as imposing an unreasonable restriction upon interstate commerce and the speedy transportation of the mail.

It is a general rule that the determination of the question whether or not an ordinance is reasonably necessary for the protection of life and property within the city is committed in the first instance to the municipal authorities thereof by the legislature. When they have acted and passed an ordinance, it is presumptively valid, and, before a court will be justified in holding their action invalid, the unreasonableness or want of necessity of such measure for the public safety and for the protection of life and property should be clearly made to appear. It should be manifest that the discretion imposed on the municipal authorities has been abused by the exercise of the power conferred by acting in an arbitrary manner. *Knobloch v. Chicago, M. & St. P. R. Co.*, 31 Minn. 402; *Evison v. Chicago, St. P., M. & O. R. Co.*, 45 Minn. 370, 11 L. R. A. 434. So far as we have observed there is nothing in the record showing that the ordinance in question is unreasonable or unnecessary. That the municipal authorities had in view the rights of the company, as well as the protection of its own citizens, is manifest from the proviso allowing unlimited speed of trains where watchmen are provided or where gates or bars are erected to guard the tracks. That this might impose some additional burden upon the company cannot, we think, be urged as an objection to the ordinance.

The district court instructed the jury that the burden of proof was upon the state to establish each and all of the material facts charged in the complaint by clear and satisfactory evidence; that the prosecution, while criminal in form, was in fact civil; that it was not necessary for the state to establish the facts charged beyond a reasonable doubt; that the material facts should, however, be clearly and satisfactorily established by a preponderance of the evidence before finding the defendants guilty. Exceptions to the instructions were taken by the defendants, and are now assigned as error, it being insisted that the proceeding was criminal in its nature, and that evidence beyond a reasonable doubt was necessary to convict. At common law, and independent of statutory enactments, punishments for the violation of municipal ordinances were treated in the light of civil actions; imprisonment for noncompliance with the order of the court imposing the payment of a fine being looked upon, not in the light of punishment, but as a means of compelling a compliance with the orders of the court and enforcing payment. The general doctrine appears to be that, where an act is not criminal under the laws of the state, a municipal ordinance will not make it so, and that an action to recover a penalty prescribed by a municipal ordinance on account of an act not criminal by the general law of the state, but forbidden by such ordinance, is a civil action. *City of Huron v. Carter*, 5 S. Dak. 4, 57 N. W. 947. McQuillan, Municipal Ordinances, sec. 190, asserts that the weight of judicial authority holds that the prosecution for the violation of a municipal ordinance is in the nature of a civil action for the recovery of a debt. Sometimes the action is regarded as criminal where the offense constitutes a misdemeanor under the laws of the state; but ordinances of the character of the one in question, forbidding the doing of an act that is not *per se* criminal or immoral, that is not made a crime or misdemeanor by any law of the state, is a mere rule or regulation for the government of the community within the municipal limits,

and does not come within the category of acts considered criminal under our constitution or statutes. In *Sutton v. McConnell*, 46 Wis. 269, 50 N. W. 414, the supreme court of Wisconsin, in answer to the argument that a prosecution for the violation of a city ordinance was a criminal prosecution, said: "We think it is not. No law in force when that prosecution was instituted made it a criminal offense to use wanton or obscene language within the corporate limits of the city of Columbus. The use of such language there gave the city a right of action against the offender to recover a prescribed penalty therefor. Under the charter of the city an action to recover such a penalty may be commenced either by summons or warrant. But whether commenced by the one process or the other, the pleadings and judgment are the same. In either case it is nothing more than a civil action to recover a penalty. Hence, it was competent for the magistrate, as in other civil actions, to act upon the stipulation of the parties, and to determine the action and render final judgment therein."

Section 8751, Ann. St., found in the chapter relating to cities and villages, is in the following language: "Fines may in all cases, and in addition to any other mode provided, be recovered by suit or action before a justice of the peace, or other court of competent jurisdiction, in the name of the state. And in any such suit or action where pleading is necessary, it shall be sufficient to declare generally for the amount claimed to be due in respect to the violation of the ordinance, referring to its title and the date of its adoption or passage, and showing as near as may be the facts of the alleged violation." From this it will be seen that the legislature contemplated a civil action for the recovery of a fine imposed for the violation of an ordinance, and in such case clear and satisfactory proof of the violation would certainly be sufficient to warrant a recovery. In *Toledo, P. & W. R. Co. v. Foster*, 43 Ill. 480, brought to recover a penalty of $50 imposed upon railways for a failure to sound a whistle or ring a

bell for 80 rods before arriving at a crossing, the court said: "While the law does not require the same completeness of proof in cases of this character that is required in criminal prosecutions where life or liberty is in jeopardy, yet the evidence must be of such a character as to bring home to the jury a reasonable and well-founded belief of the guilt of the defendant.    Neither a railway company nor a private individual should be subjected to a fine, whereby their property is to be divested, merely because there is a little more evidence that they did not perform some required act than there is that they did."    The instruction here under consideration required something more than a preponderance of the evidence.    It required that the charge against the defendant should be established by clear and satisfactory evidence, and this is in full accord with the Illinois rule.

It is further urged that if the action is civil in its nature the fine imposed is in the nature of a debt due from the defendants, and that to imprison them for its nonpayment, as required by the ordinance, would violate our constitutional provision prohibiting imprisonment for debt.    It is well settled that a direction in a sentence imposing a fine that defendant shall stand committed until the fine is paid is no part of the penalty for the offense, but is merely a means of compelling obedience to the judgment of the court.    19 Cyc. 553, and authorities cited. A fine is not a debt within the meaning of the constitutional provision referred to.    *In re Beall,* 26 Ohio St. 195.

After a careful examination of the record and the questions presented we are unable to discover any reversible error, and recommend an affirmance of the judgment.

EPPERSON and GOOD, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.